STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. AP00-023

REC -CUM -12/31/2000

ANTHONY and JULIE ARMSTRONG,

Plaintiffs

v.

## ORDER ON 80B APPEAL

TOWN OF CAPE ELIZABETH
and DANIEL and DIANE CAPUTO,

DONALD L. GARBRECHT
LAW LIBRARY

JAN 3 2001

Defendants

## FACTUAL BACKGROUND

On December 13, 1999, Cape Elizabeth Code Enforcement Officer ("CEO") Bruce Smith issued a building permit to Daniel and Diane Caputo for their property located at 31 Lawson Road. The Caputos' property is located in the Shoreland Performance Overlay District, which requires that structures be set back 75' from the normal high water line. Any structure that violates the 75' setback requirement may not be expanded by more than 30%.

The Armstrongs appealed to the Cape Elizabeth Zoning Board of Appeals ("ZBA") CEO Smith's issuance of the permit allowing the Caputos to increase the vertical height of their home. The Plaintiffs advanced three main arguments at the hearing. First, CEO Smith incorrectly located the normal high water line on the Caputos' property, with the result that only part of the property was included within the 75 foot setback. Second, the floor area and volume of the structure's lower level was incorrectly included in the calculation of the existing floor area. Third, the zoning ordinance and state law prohibit expansion of a structure within the

shoreland setback area if it would increase the nonconformity of the structure.

CEO Smith provided information consisting of a memo dated January 19, 2000, photographs of the oceanfront adjacent to the Caputo property and a tide chart for the month of January, 2000 to the ZBA prior to the February 1, 2000 hearing. In his January 19, 2000 memo, the CEO stated that when determining a normal high water line he considers the visual markings, vegetation line, man-made features such as the seawall, and the normal high tide. At the hearing, he testified that he initially determined the high water line to be 21 feet seaward of the sea wall. However, this was changed to 16 feet based on a plotted NGVD[1] of 10 and a revisit of the site because he felt "3% uncomfortable" with 21 feet but "100% comfortable" with the high water mark 16 feet seaward of the sea wall. The result of this determination was that only a portion of the Caputo residence is within the 75' setback of the normal high water line. The Caputo's architect David Lloyd testified at the hearing that the proposed expansion was less than 30%. The CEO determined the expansion to be 6% of the square footage and 13% of the volume. This calculation included the lower level of the structure. David Lloyd testified that even excluding the lower level of the structure, the proposed expansion was still only a 21% enlargement.

The ZBA upheld the issuance of the building permit, finding that CEO Smith correctly determined the normal high water mark. The Board also found that (1)

---

[1] NGVD 1929, or National Geodetic Vertical Datum, is the zero point for referencing surface elevation. <u>Bayou Des Familles Dev. Corp. v. United States Corps of Engineers</u>, 541 F. Supp. 1025, 1034 (E. D. La. 1982).

only a portion of the main structure was within the 75' shoreland setback; (2) whether the lower level of the Caputos' home is determined to be a basement or not, the expansion is still less than the allowable 30% increase; (3) the expansion would not increase the nonconformity of the structure in violation of the Ordinance and state law; and (4) the expansion of less than 30% is in compliance with the Ordinance and state law. The Armstrongs' administrative appeal was therefore denied.

## DISCUSSION

### I. Due Process

The Armstrongs make three primary arguments in support of their claim that due process was violated. First, that they were denied a fair and impartial hearing because the ZBA based its decision on documents not in evidence at the hearing. Administrative hearings, however, are not subject to the rules of evidence. See, e.g., In re Application of Spurling, 595 A.2d 1062, 1065 (Me. 1991) (noting that the development of 80B and 80C records are not governed by the Rules of Evidence); In re Maine Clean Fuels, Inc., 310 A.2d 736, 748 (Me. 1973) ("It is a widely accepted proposition that the highly technical rules of evidence are not, and should not, be applicable to administrative proceedings.").

It is also alleged that because a packet of documents was provided to the Board prior to the hearing by CEO Smith, that evidence was not part of the record and the Board could not properly consider it. It is true that only evidence made a part of the record can be considered by the Board in making its decision. City of Biddeford v.

Adams, 1999 ME 49, ¶ 10, 727 A.2d 346, 349 (finding a violation of due process when the Board members visited the neighborhoods at issue in a tax abatement case after the Board finished taking evidence but before it began deliberations without providing the appellants notice and an opportunity to comment). The purpose of this requirement is to allow a party the opportunity to explain adverse evidence. Id. "To the extent that an agency relies on information obtained outside of the record and the proceedings, it has acted improperly." Id. The informational packet submitted by CEO Smith was part of the record because, unlike Adams, the information was received by the ZBA before it finished taking evidence. The Board did not improperly consider the CEO's information and did not violate the Armstrongs' due process rights.

Second, the Armstrongs allege they were prevented from rebutting the evidence in the CEO's packet because it was submitted prior to the hearing, that it was in error for the CEO to sit with the ZBA and give advice, and that they were prevented from cross-examining CEO Smith in violation of 30-A M.R.S.A. § 2691.[2] The Armstrongs were not prevented from rebutting the evidence in the CEO's packet even though it was submitted prior to the hearing. Their presentation and exhibits directly rebutted the CEO's findings. The fact that the CEO sat with the ZBA and gave advice was also not in error. CEO Smith was required under the Cape

---

[2] That statute provides "[e]very party has the right to present the party's case or defense by oral or documentary evidence, to submit rebuttal evidence and to conduct any cross-examination that is required for a full and true disclosure of the facts." 30-A M.R.S.A. § 2691(3)(D) (1996).

Elizabeth Ordinance to attend the hearing and to submit all evidence relevant to the ZBA proceedings. See CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. VI, § 19-5-3(B) (1999) ("The Code Enforcement Officer, unless excused, shall attend all hearings on appeals and applications and shall present to the Board all plans, photographs or other factual materials which are relevant to the proceeding."). The record also reflects that the Armstrongs were not *prevented* from cross-examining the CEO or providing rebuttal evidence. The Armstrongs never asserted their right to cross-examine, despite ample opportunity.

Finally, the Armstrongs allege a due process violation because at least one Board member made his decision prior to the hearing. After the vote but during a discussion about potential Board procedures, Board member Joe Frustaci stated

> I think it's very, very important that we have anything on any case that receive -- that we review to have stuff before us so that we're not bombarded with legal issues, cases presented to us or any other information. It distorts our judgment. Confuses us after we have spent a weekend reviewing information and feeling comfortable. I felt comfortable coming into this meeting tonight that Bruce [Smith] had done his homework, that the Caputos basically had brought a surveyor out there and established the line. But then to have other information brought before us I think -- I thought it only complicated the matter and dragged it out a lot longer.

R. at 117. The Armstrongs admit that it is impossible to tell whether other Board members made up their minds prior to the hearing or what impact this Board member's views had on them. However, they argue, this member was very vocal from the beginning of the hearing as he attempted to preclude Plaintiffs from submitting documentary evidence and was extremely hostile to Plaintiffs' position

throughout the hearing. Although Board member Frustaci objected to the Armstrongs' submission of a thick packet of information at the hearing, no evidence of bias exists in the record. He abstained from the vote to accept the evidence rather than opposing it. There also is no evidence of hostility toward the Plaintiff. In fact, Frustaci questioned CEO Smith about whether the height of the proposed structure conformed with the Town's height restriction, an issue not raised by the Plaintiffs. R. at 115.

The fact that member Frustaci relied on information presented to the Board by the CEO in advance and was potentially swayed by this information does not amount to bias. In Turbat Creek Preservation, LLC v. Town of Kennebunkport, 2000 ME 109, ¶ 9, 753 A.2d 489, 491, the appellant alleged that the Chair of the Board demonstrated bias by preparing an outline of the issues and potential findings based on the appellant's written materials that were submitted prior to the hearing. The Law Court held that there is no prohibition on a board member reviewing documents and preparing a memo of potential findings to assist either that member or the Board as a whole in consideration of issues that may arise at the hearing. Id.

II. Improper Burden-shifting by the ZBA

Relying on Lewis v. Town of Rockport, 1998 ME 144, ¶ 15, 712 A.2d 1047, 1050, the Armstrongs argue that the ZBA improperly placed the burden on them to prove a violation rather than requiring the Caputos to prove compliance. The Board required the Plaintiffs to go first and give their arguments for why the CEO's decision had been appealed and never asked CEO Smith to make an official

presentation. Contrary to the Plaintiffs' assertions, however, the ZBA did require Mr. Caputo to establish his compliance with the Ordinance. CEO Smith not only submitted his evidence establishing the Caputos' compliance prior to the hearing, he also answered questions posed by the Board. Although the Plaintiffs presented their case first, the Board did not improperly place the burden of proving noncompliance on the Plaintiffs.

## III. Definition of "Normal High Water Line of Coastal Waters"

The meaning of a term in a zoning ordinance is a question of law. H.E. Sargent, Inc. v. Town of Wells, 676 A.2d 920, 923 (Me. 1996). The ZBA's interpretation of its own ordinance must be reasonable, based on facts in the record, and consistent with the Zoning Ordinance as a whole. See Your Home, Inc. v. City of Portland, 432 A.2d 1250, 1260 (Me. 1981). The definition of "normal high water line of coastal waters" in the Ordinance is "[t]hat line on the shore of tidal waters which is the *apparent extreme limit of the effect of the tides*, i.e. the top of the bank, cliff or beach above high tide." CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. I, § 19-1-3 (1999) (emphasis added). Based on Mack v. Municipal Officers of the Town of Cape Elizabeth, 463 A.2d 717 (Me. 1983), the Armstrongs argue that the Ordinance definition was incorrectly interpreted not to include waves and sea spray. In Mack, the Law Court interpreted the Cape Elizabeth Zoning Ordinance term "normal high water mark"[3] to be that line upon which the extreme limit of the effect of the tide is

---

[3] In 1983, the definition of "normal high water mark" was identical to the current Cape Elizabeth Ordinance definition of "normal high water line." See Mack v. Municipal Officers of the Town of Cape Elizabeth, 463 A.2d 717, 721 (Me. 1983);

visually recognizable, rejecting an interpretation that the phrase means the exact still-water level of the extreme limit of the tide itself. Id. at 721.

Defining sea wall as "a strong wall or embankment to prevent the encroachment of the sea, serve as a breakwater, etc.," the Armstrongs argue that the only conclusion that may be reached is that the sea wall is the apparent extreme limit of the effect of the tides. Therefore, they argue, the ZBA erred when it determined that the line was 16 feet seaward of the sea wall. However, a man-made structure is not necessarily the *apparent* extreme limit of the tide's effect. In Mack, the town building inspector located the normal high water mark by observing "a line of vegetation, beyond which the topography is characterized by jagged ledge and small pools." Id. at 721. As in this case, a visual determination of the apparent extreme limit of the *effects* of the tides was a sufficient means of determining "normal high water mark" in Mack. See id. The Board correctly interpreted the Ordinance by focusing on the apparent effects of the tide rather than by assuming that the sea wall, by default, necessarily establishes the normal high water line.

## IV. Substantial Evidence

"Substantial evidence exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion; the possibility of drawing two inconsistent conclusions does not render the evidence insubstantial." Adelman v. Town of Baldwin, 2000 ME 91, ¶ 12, 750 A.2d 577, 583. In addition, "[t]he Board is not bound to accept any particular evidence as true; as fact-finder, it has the obligation to

---

CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. I, § 19-1-3 (1999).

determine credibility." Id. ¶ 14. The Armstrongs argue that, based on the evidence in the record, the ZBA could not fairly and reasonably reach the conclusion that the normal high water line is 16 feet seaward of the sea wall. They contend that the evidence compels the conclusion that the normal high water line is the sea wall.

The ZBA decision is supported by substantial evidence in the record. The photographs submitted by the Armstrongs show vegetation inland of the line drawn by CEO Smith as well as untouched snow on the shoreline near the sea wall. R. at 36-40. The photographs submitted by CEO Smith prior to the hearing show a snow line inland of the 16 foot normal high water line, even after an astronomical high tide. CEO Smith's 1/25/00 Memo to ZBA. Mr. Caputo testified that there were rose bushes growing on the seaward side of the sea wall and Mr. Armstrong testified that grass grows on the seaward side of the sea wall. R. at 99, 101. The existence of contrary evidence in the record does not compel the conclusion that the ZBA's decision was based upon insubstantial evidence.

## V. The Nonconformity of the Structure

The Armstrongs argue that any expansion of a nonconforming structure is prohibited by Lewis v. Town of Rockport. In Lewis, Maine Coast Artists were granted a special exception to expand and modify its art gallery. Lewis, 1998 ME 144, ¶ 2, 712 A.2d at 1048. Section 505 of the Rockport land ordinance provided that "[u]pon approval of the Zoning Board of Appeals, a nonconforming aspect of a lot, structure or use may be changed such that it is less nonconforming or no more nonconforming than the existing situation." Id. ¶ 4 n.1. The then-existing building

9

was twenty feet higher than permissible and encroached on the six-foot sideyard setback by less than one foot. Id. ¶ 10, 712 A.2d at 1049. The zoning board, employing a "limit of nonconformance" theory, reasoned that as long as the addition to the building would not encroach more than the several inches into the sideyard than it already did and it would not be taller than the then-current height, the completed building would be no more nonconforming than the original structure. Id. The Law Court rejected this reasoning, holding that to increase the square footage or volume within a setback area is to increase the nonconformity of the structure. Id. ¶ 13, 712 A.2d at 1050.

Applying that holding to this case, the Armstrongs argue that because the expansion to 31 Lawson would increase both the volume and square footage of the existing nonconforming structure, it violates both § 19-4-4(B)(1) of the Ordinance and 38 M.R.S.A. § 439-A(4). Unlike the Rockport ordinance, however, the Cape Elizabeth Ordinance expressly allows for expansion of non-conforming structures. The Ordinance provides that

> A nonconforming structure may be added to or expanded after obtaining a permit from the Code Enforcement Officer, *provided that such addition or expansion does not increase the nonconformity of the structure.*
>> a. After January 1, 1989, if any portion of a structure does not meet the required setback from the normal high-water line of a water body or wetland upland edge, *that portion of the structure shall not be expanded in floor area or volume by more than 30% during the lifetime of the structure.*

CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. IV, § 19-4-4(B)(1) (1999) (emphasis added).

The Armstrongs contend that the portion of the Ordinance permitting expansion of a non-conforming structure up to 30% should be ignored because it contradicts the provision that an expansion cannot increase the non-conformity of the structure. The Cape Elizabeth Ordinance provides "[w]henever another provision of this Ordinance conflicts with or is inconsistent with another provision of this Ordinance or any other ordinance, regulation or statute, the more restrictive and specific provision shall control." CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. X, § 19-10-1 (1999). When an ordinance contains a general provision which would include matters embraced in a specific provision contained in the same ordinance, "the general provision must be understood to affect only those cases within its general language that are not within the provisions of the specific provision. The result is that the specific provision controls." Ziegler v. American Maize-Products Co., 658 A.2d 219, 222 (Me. 1995); see also Camps Newfound/Owatonna Corp. v. Town of Harrison, 1998 ME 20, ¶ 19, 705 A.2d 1109, 1115 ("[S]pecific statutory provisions take precedence over general provisions."). The provision restricting expansions of nonconforming structures to 30% is more specific than the general provision that an expansion may not increase the nonconformity. The more specific provision therefore prevails.

The proposed expansion also does not violate 38 M.R.S.A. § 439-A(4). That statute provides

> Notwithstanding any provision in a local ordinance to the contrary, all new principal and accessory structures and substantial expansions of such structures within the shoreland zone...must meet the water setback requirements approved by

11

the board...For purposes of this subsection, a substantial expansion of a building is an expansion that increases either the volume or floor area by 30% or more. This subsection is not intended to prohibit a municipal board of appeals from granting a variance...nor is it intended to prohibit a less than substantial expansion of a legally existing nonconforming structure, *as long as the expansion does not create further nonconformity with the water setback requirement.*

38 M.R.S.A. § 439-A(4) (Pamph. 1999) (emphasis added).

The statute's limitation on expansions creating further nonconformity *with* as opposed to *within* the water setback requirement indicates an intent to prohibit expansion toward the water, but not an intent to prohibit all expansions within the setback. The setback in the Ordinance is 75 feet for new principal structures, but the setback is what it is for preexisting structures. CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. VI, § 19-6-11(E)(2) (1999). Setbacks are the "shortest horizontal distance from the foundation, sills or other supports of a building or other structure, or from the edge of the improved areas of any other improvement, to the normal high-water line." CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. VI, § 19-6-11(E)(2)(e) (1999). The setback is therefore a distance; in this case, 54 feet. R. at 43. The Caputos' proposed enlargement does not increase the nonconformity with the setback because it does not encroach closer than 54 feet. Instead, the expansion involves an increase from 24 feet to 30 feet in height. R. at 2. Because the enlargement does not create further nonconformity with the setback requirement, the state statute is not violated.

This interpretation is consistent with the Maine Department of Environmental Protection ("DEP") interpretation as well as the Cape Elizabeth

12

Ordinance. The DEP profile[4] explains that while both volume and floor area can be expanded within the 75 foot setback up to the 30% limitation, expansions that reduce the already non-conforming setback are not permitted. Maine Department of Environmental Protection: Non-Conforming Structures in the Shoreland Zone Issue Profile, *available at* http://janus.state.me.us/dep/blwq/docstand/ip-slz.htm (Oct. 1996). The DEP explains the statute in terms of a limitation rather than a total prohibition on expansions within the setback.[5] Id. Viewing the statute as limiting rather than prohibiting all-expansions of nonconforming structures within the setback is also consistent with the Cape Elizabeth Ordinance, which limits expansion of the nonconforming portion of a structure to a 30% expansion. See CAPE ELIZABETH, ME., ZONING ORDINANCE ch. 19, art. IV, § 19-4-4(B)(1) (1999).

This interpretation of the statute is also not inconsistent with Lewis v. Town

---

4 The Non-Conforming Structures in the Shoreland Zone Issue Profile is part of the Issue Profile online publication that provides DEP interpretations and opinions on various environmental topics. See Maine DEP Online Publications, *available at* http://janus.state.me.us/dep/mdep_pub.htm#DEP_Issue_Profiles.

5 The Non-conforming Structures in the Shoreland Zone Issue Profile is in question-and-answer format, providing an interpretation of the Mandatory Shoreland Zoning Act, 38 M.R.S.A. § 439-A(4). See http://janus.state.me.us/dep/blwq/docstand/ip-slz.htm (Oct. 1996). This profile explains that non-conforming structures can be expanded. "The law prohibits any portion of a structure which does not meet the shoreline setback requirement (typically 75 or 100 feet) from being expanded by 30% or more in floor area and volume. In addition, such structures cannot be expanded closer to the shoreline." Id. This "expansion limitation...applies only to that part of the structure which is non-conforming. It does not apply to that part of the structure which meets the setback requirement." Id. In addition, the DEP explains that "[b]oth the volume and floor area [of a fully non-conforming structure] may be expanded up to the 30% limitation. However, neither the floor area nor volume expansions can exceed the limitation." Id.

of Rockport, 1998 ME 144, ¶ 4 n.1, 712 A.2d at 1048. The Lewis Court, in interpreting the Rockport ordinance, which prohibited a change unless it was "less nonconforming or no more nonconforming," found that "[a]ny modification of or addition to a building that would increase the square footage of nonconforming space within the building, even if it would not increase the linear extent of nonconformance, does make the building more nonconforming." Id. ¶ 13, 712 A.2d at 1050. The state statute in this case, on the other hand, provides that an expansion of a nonconforming structure may not create "further nonconformity *with the water setback requirement.*" 38 M.R.S.A. § 439-A(4) (emphasis added). While the Rockport ordinance prohibits all expansions of a nonconformity, the state statute's language is a prohibition on creating further nonconformity only as it pertains to the water setback requirement.

The entry is

Plaintiff's 80B appeal is DENIED.

Dated at Portland, Maine this 21st day of December, 2000.

Robert E. Crowley
Justice, Superior Court

14

Date Filed __03-17-00__          __CUMBERLAND__          Docket No. __AP-00-023__ __

                                      County

Action __APPEAL 80(B)__

ANTHONY AND JULIE ARMSTRONG DONALD L. GARBRECHT
LAW LIBRARY          MUNICIPAL OFFICERS OF THE TOWN
                                                  OF CAPE ELIZABETH

                                                  DANIEL AND DIANE CAPUTO

JAN 3 2001

                                          vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| PRO SE<br>32 LAWSON ROAD<br>CAPE ELIZABETH, MAINE | MICHAEL HILL, ESQ. (Cape E)<br>95 EXCHANGE STREET<br>PORTLAND, MAINE  04112<br>774-3906<br><br>JOHN MCVEIGH, ESQ.<br>P.O. BOX 9546    (Caputos)<br>PORTLAND, MAINE   04112-9546<br>791-3000 |

Date of
Entry