STATE OF MAINE                                              SUPERIOR COURT

Cumberland, ss.

REC'D CUMB CLERKS OF
DEC 10 '18 AM 10:02

RUSSELL CHRETIEN

                    Plaintiff

          v.                          Docket No. PORSC-CV-17-265

BERMAN & SIMMONS and WILLIAM ROBITZEK

                    Defendants

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Motion for Summary Judgment of Defendants Berman & Simmons, P.A. and William Robitzek (together "Defendants") is before the court for decision. Oral argument was held November 6, 2018, at which point the court took the Motion under advisement.

### Factual Background

From 1987 to 2000, Plaintiff, Russell Chretien, worked as an agency manager for Allstate Insurance Company ("Allstate"). (Defendants' Supporting Statement of Material Facts) (Supp'g S.M.F.) ¶ 1.) In 2006, Mr. Chretien entered into an Exclusive Agency Agreement ("EAA") with Allstate. (Supp'g S.M.F. ¶ 3.)

The EAA governed the work relationship between Allstate and Mr. Chretien and included a Termination Payment Provision ("TPP") in the event the EAA was terminated. (Supp'g S.M.F ¶ 4.) If triggered the TPP would provide Mr. Chretien with payment equal to his eligible earned insurance premiums multiplied by 1.5 over

a 12-month period. (Supp'g S.M.F ¶ 4.) The EAA alternatively allowed for Mr. Chretien to sell his book of business to a buyer approved by Allstate instead of collecting the TPP payment. (Supp'g S.M.F ¶ 4.) The EAA placed restrictive covenants on Mr. Chretien and his employees not to disclose confidential information both before and after termination. (Supp'g S.M.F ¶ 4.) The EAA could be terminated in the following ways: 1) by mutual agreement; 2) by either party, with or without cause, by providing 90-day notice; and 3) by Allstate for cause. (Supp'g S.M.F ¶ 6.)

In 2010, Mr. Chretien planned to expand his agency by purchasing books of business from other Allstate agents. (Opposing Statement of Material Facts (Add. S.M.F.) ¶ 162.) Acquisition of these books was subject to the EAA. (Add. S.M.F. ¶ 162.)

Prior to giving Mr. Chretien approval for these purchases, Allstate incorporated a new coverage program and discontinued its Deluxe Plus Plan. (Add. S.M.F. ¶ 164.) This new program resulted in certain Allstate insureds losing their coverage. (Add. S.M.F. ¶ 164.) The new program concerned Mr. Chretien and he shared this concern with Allstate. (Add. S.M.F. ¶ 167.) Concurrently, Mr. Chretien helped two customers whose policies had not been renewed appeal their non-renewals with the Maine Bureau of Insurance. (Add. S.M.F. ¶ 168.) These appeals were sustained in favor of the customers in June 2011. (Add. S.M.F. ¶ 168.) In light of this outcome, Allstate abandoned its new coverage program in Maine. (Add. S.M.F. ¶ 169.)

Allstate denied Mr. Chretien's plan to purchase the additional books of business. Plaintiff's Additional Statement of Material Facts (Add. S.M.F.) ¶ 171.

In the spring of 2011, Mr. Chretien began speaking with United Insurance Group ("United") about potentially affiliating with United rather than Allstate. (Supp'g S.M.F. ¶ 18.) On September 30, 2011 Mr. Chretien accepted a position with United as a vice-president. (Supp'g S.M.F. ¶ 23.) That same day, Mr. Chretien notified Allstate that he would no longer be an exclusive agent of Allstate by sending a 90-day written notice of termination pursuant to the EAA. (Supp'g S.M.F. ¶ 25.) In his termination notice, Mr. Chretien claimed he was the victim of whistleblower retaliation for supporting the Allstate customers in their appeals of Allstate's nonrenewals of coverage. (Supp'g S.M.F. ¶ 26.)

On December 20, 2011, prior to the 90-day termination initiated by Mr. Chretien, Allstate terminated Mr. Chretien's Allstate agency, (Supp'g S.M.F. ¶ 38.) Allstate cited Mr. Chretien's simultaneous employment with the United as the reason for the termination.[1] (Supp'g S.M.F. ¶ 38.) Allstate's termination letter stated that Mr. Chretien was required to comply with the confidentiality and non-solicitation provisions of the EAA and immediately return all of Allstate's property. (Supp'g S.M.F. ¶ 39.) As for compensation, Allstate indicated that Mr. Chretien could either take his TPP or sell his book of business before April 1, 2012. (Supp'g S.M.F. ¶ 39.)

---

[1] Mr. Chretien maintains that while this is the reason put forth by Allstate, the firing was actually retaliation for his whistleblowing activity. (Add. S.M.F. ¶ 38.)

3

On December 22, 2011, Mr. Chretien sent a letter to his Allstate customers which included information about his new United Agency Insurance business. (Supp'g S.M.F. ¶¶ 40-41.) Mr. Chretien officially opened his United Insurance branch by January 1, 2012. (Supp'g S.M.F. ¶ 44.)

On January 5, 2012, Allstate sent Mr. Chretien a cease and desist letter, alleging that he was violating the restrictive covenants of the EAA. (Supp'g S.M.F. ¶ 47.) Allstate's letter informed Mr. Chretien that if he was in violation of the EAA covenants, Allstate may "withhold any or all remaining termination payments, and [ ] pursue injunctive relief, monetary damages, attorney fees, and expenses." (Supp'g S.M.F. ¶ 48.)

During the week of January 16, 2012, Mr. Chretien met with Attorney William Robitzek of Berman & Simmons to discuss Mr. Chretien's dispute with Allstate. (Supp'g S.M.F. ¶ 52.) As a result, Mr. Chretien retained the Berman & Simmons firm and attorney Robitzek to represent him in connection with claims by and against Allstate.

On January 31, 2012, Allstate filed a complaint against Mr. Chretien and three of his employees in federal court. (Supp'g S.M.F. ¶ 54.) Allstate's complaint alleged four causes of action against Mr. Chretien: 1) breach of contract, 2) misappropriation of trade secrets and confidential information, 3) unfair competition, and 4) tortious interference. (Supp'g S.M.F. ¶ 55.)

On March 5, 2012, Mr. Chretien through attorney Robitzek answered Allstate's Complaint and asserted a counterclaim under the following theories of liability: 1)

4

breach of contract, 2) tortious interference, 3) unfair competition, 4) conversion, 5) fraud, and 6) violation of Maine's Whistleblowers' Protection Act, 26 M.R.S. §§ 831 et seq. (Supp'g S.M.F. ¶ 59.)

Attorney Robitzek did not file a Whistleblower Protection Act claim with the Maine Human Rights Commission (MHRC) on behalf of Mr. Chretien. (Add. S.M.F. ¶ 200.)

By statute, as a result of attorney Robitzek's failure to file a complaint on behalf of Mr. Chretien with the MHRC within 300 days of the alleged discriminatory act, Mr. Chretien could not recover compensatory and punitive damages and attorney's fees under the Maine Whistleblowers' Protection Act in his counterclaim against Allstate. (Add. S.M.F. ¶ 201.) See 5 M.R.S. §§ 4611, 4622(1). The reason is that Whistleblowers' Protection Act claims are subject to the MHRC process, see 26 M.R.S. § 834-A ("Arbitration before the Maine Human Rights Commission"). A Whistleblowers' Protection Act claim must be filed with the MHRC, in the same way as other employment discrimination claims must be, in order to preserve the claimant's ability to recover compensatory and punitive damages and attorney fees in a subsequent action in court.

In the summer of 2012, Allstate agreed to a confidential settlement with the three employees that were named as defendants in the January 31 Complaint, and the case proceeded between Allstate and Mr. Chretien only. (Supp'g S.M.F. ¶ 63.) Around that time, Allstate offered to settle with Mr. Chretien by paying his TPP amount minus $40,000. In July 2012, Mr. Chretien offered to settle all of his claims

5

for $445,000 (Supp'g S.M.F. ¶¶ 85, 102, 109). No settlement was reached and the parties entered into mediation on November 27, 2012. (Supp'g S.M.F. ¶ 67.) No settlement was obtained during mediation. (Supp'g S.M.F. ¶¶ 68-71.)

On December 20, 2012, Allstate amended its complaint to add an additional breach of contract claim. (Supp'g S.M.F. ¶¶ 60-61.) On January 3, 2013, and March 21, 2013, Attorney Robitzek sent letters to Mr. Chretien, warning Mr. Chretien of the risks of going to trial and encouraging him to settle for $300, 000. (Supp'g S.M.F. ¶¶ 72-77.)

During April 2013, attorney Robitzek became aware that his failure to file a complaint with the Maine Human Rights Commission precluded Mr. Chretien from recovering compensatory and punitive damages and attorney fees on Mr. Chretien's Whistleblowers' Protection Act claim. (Add. S.M.F. ¶ 208.) However, attorney Robitzek did not inform Mr. Chretien of his realization for more than a year, until May 2014. (Add. S.M.F. ¶ 225.)

On July 12, 2013, both parties filed for summary judgment. (Supp'g S.M.F. ¶¶ 81-82.) Magistrate Judge Kravchuk's November 2013 recommended decision on the cross-motions granted summary judgment to Mr. Chretien on Allstate's claims for unfair competition and tortious interference, and granted summary judgment to Allstate on Mr. Chretien's counterclaims for tortious interference, unfair competition, conversion, and fraud. (Supp'g S.M.F. ¶¶ 85-86.)

Allstate's motion for summary judgment sought judgment as well on Mr. Chretien's whistleblower counterclaim, based on Allstate's contention that Mr.

6

Chretien was not an employee of Allstate and therefore not entitled to protection under the Act, but Magistrate Judge Kravchuk recommended denying Allstate's motion in that regard, based on her conclusion that independent contractors could be protected by the Act. (Add. S.M.F. ¶ 228 & Tab 9).

Judge Hornby affirmed and adopted Magistrate Judge Kravchuk's recommended decision in December 2013. (Supp'g S.M.F. ¶ 86.)

Shortly after this on May 22, 2014, Attorney Robitzek advised Mr. Chretien in a letter that he had not filed the Whistleblower Protection Act claim with the Maine Human Rights Commission within the 300-day deadline. (Supp'g S.M.F. ¶ 94); see (Def.'s Tab(B).) Attorney Robitzek's letter explained that this would likely result in Mr. Chretien losing his ability to make a claim for compensatory and punitive damages, and attorney fees on the Whistleblowers' Protection Act counterclaim. (Supp'g S.M.F. ¶ 94.) Attorney Robitzek's letter also addressed the potential conflict of interest this created and informed Mr. Chretien that he could seek new counsel. (Supp'g S.M.F. ¶ 94.) Mr. Chretien decided to continue with Attorney Robitzek and proceed to trial, which was scheduled to begin in less than two weeks. (Supp'g S.M.F. ¶ 98.)

On June 2, 2014, during a conference, the trial judge, Magistrate Judge John Nivison, decided to allow Mr. Chretien to proceed and present evidence on his Whistleblowers' Protection claim, but only for limited equitable relief, including front pay and back pay, and not for compensatory damages, punitive damages, and attorney's fees. (Supp'g S.M.F. ¶ 100.)

7

On June 5, 2014, after three days of trial, Attorney Robitzek gave Mr. Chretien a letter discussing settlement. (Supp'g S.M.F. ¶ 107; Tab 1(S)) In this letter Attorney Robitzek explained the state of the whistleblower claim (limitation on damages and attorney's fees), advised Mr. Chretien to obtain independent counsel for settlement, discussed what damages could be awarded to both Mr. Chretien and Allstate at trial and the risks associated with continuing the trial. (Supp'g S.M.F. ¶¶ 108-111; Tab 1(S) at 2-3) The letter indicated that best case outcome for Mr. Chretien would be a verdict in the one million dollar range and the worst case outcome would be a verdict for Allstate of several hundred thousand dollars. Tab 1(S) at 3. However, Mr. Chretien claims that there was little downside risk in an adverse verdict because he was prepared to declare bankruptcy if the verdict went against him, although he had also been working to avoid bankruptcy. (Add. S.M.F. ¶ 260); Defendant's Reply Statement of Material Facts (Rep. S.M.F.) ¶ 260.

On June 6, 2014, two of the trial jurors reported to Judge Nivison, what they believed to be inappropriate behavior by Mr. Chretien during his testimony. (Supp'g S.M.F. ¶¶ 114-16). Judge Nivison interviewed each juror individually about the juror's report with counsel present. (Supp'g S.M.F. ¶ 117.) The jurors appeared not to have a favorable impression of Mr. Chretien, but it was not clear that the jury was leaning against Mr. Chretien. (Add. S.M.F. ¶ 117).

On June 6, 2014, the parties attended a settlement conference with Judge Kornreich. (Supp'g S.M.F. ¶ 119.) Attorney Paul Brown attended the settlement conference as a representative of Mr. Chretien. (Supp'g S.M.F. ¶ 119.) Judge

8

Kornreich recommended a specific dollar payment by Allstate to Mr. Chretien for purposes of settling all claims and counterclaims between them. (Supp'g S.M.F. ¶ 124.) He told Mr. Chretien that "he had to push Allstate hard to get up to that offer and that Allstate would not go any higher than [the recommended amount]—that was Allstate's "final number." (Id.) It was understood by Judge Kornreich and the parties that Mr. Chretien could not recover compensatory and punitive damages and attorney fees on his whistleblower claim. (Add. S.M.F. ¶ 247.)

Mr. Chretien and Allstate agreed to settle all claims and counterclaims between them for the dollar payment by Allstate to Mr. Chretien that Judge Kornreich had recommended and for a release and dismissal of all claims and counterclaims.[2] . (Supp'g S.M.F. ¶ 126.)

As the settlement documents were being drafted, Mr. Chretien sought advice on how to obtain optimal tax treatment for the settlement payment. (Supp'g S.M.F. ¶ 127.) Mr. Chretien's accountant recommended that the settlement payment be characterized as compensation for Mr. Chretien's economic interest in his terminated Allstate agency, to enable the payment to be taxed as a capital gain rather than as ordinary income. (Supp'g S.M.F. ¶¶ 127-130.) The accountant's view was that any mention of other claims, including the whistleblower claim, could result in adverse tax implications for Mr. Chretien. (Supp'g S.M.F. ¶ 130.)

---

[2] The dollar amount is not shown here because it was agreed between Allstate and Mr. Chretien to keep the dollar amount confidential.

9

Mr. Chretien and Allstate signed a confidential settlement agreement on June 10, 2014. (Supp'g S.M.F. ¶ 131.) Attorney Robitzek agree to waive his and his firm's entitlement to attorney's fees and reimbursement of litigation costs advanced on behalf of Mr. Chretien, so Mr. Chretien did not actually incur any attorney fees or costs. (Supp'g S.M.F. ¶ 132.)

At the time of the settlement, Mr. Chretien was negotiating a payoff for his Allstate book of business with TD Bank and wanted his settlement with Allstate to remain confidential. (Supp'g S.M.F. ¶¶ 134-135.)

The parties executed the settlement agreement on September 19, 2014. (Supp'g S.M.F. ¶ 137.) Allstate issued a check in the agreed-on amount to Mr. Chretien on September 23, 2014. (Supp'g S.M.F. ¶ 137.) The parties filed a stipulation of dismissal with prejudice on October 7, 2014. (Supp'g S.M.F. ¶ 138.)

Mr. Chretien's Additional Statement of Material Facts outlines his dissatisfaction and unhappiness with attorney Robitzek's handling of his case in a variety of ways, starting even before attorney Robitzek told him about his error and the consequences of it in May 2014. He asserts that, during the thirteen months between the day attorney Robitzek realized the consequences of his failure to file with the MHRC and the day he finally informed Mr. Chretien of those consequences, attorney Robitzek's heart did not seem to be in the case and that attorney Robitzek was pressuring him to settle. (Add. S.M.F. ¶¶ 221, 231, 252).

He points out that attorney Robitzek's revelation of his error in May 2014 came two weeks before the beginning of trial—too late for Mr. Chretien to obtain new

10

counsel. (Add. S.M.F. ¶¶ 233, 234). He also contends that attorney Robitzek was negligent in failing to "work up" for trial the equitable claims for front and back pay, (Add. S.M.F. ¶ 272), and in failing to keep the contemporaneous time records necessary to obtain an attorney fee award. (Add. S.M.F. ¶ 276).

Mr. Chretien also says he spoke to both attorney Robitzek and his own psychiatrist about feeling suicidal about losing the ability to pursue fully his whistleblower claim in the Allstate litigation. (Add. S.M.F. ¶¶ 264-65). He says he felt betrayed and suffered severe emotional distress on learning that attorney Robitzek had known of the error for more than a year before disclosing it. (Add. S.M.F. ¶ 267). He asserts that attorney Robitzek's conduct was "egregious" and "outrageous," and resulted in the loss of multiple forms of compensatory and punitive damages. (Add. S.M.F. ¶ 268).

Defendants in their Reply Statement of Material Facts [(Rep. S.M.F.)] dispute many of these contentions, pointing out that attorney Robitzek suggested that the court might continue the trial if Mr. Chretien wanted to retain new counsel (Rep. S.M.F. ¶¶ 233, 234), and denying that attorney Robitzek had failed to work up the equitable claims. (Rep. S.M.F. ¶ 272). Defendants also deny that Mr. Chretien ever told attorney Robitzek about feeling suicidal and say there is little evidence that the Allstate case came up a source of stress or distress in Mr. Chretien's sessions with his psychiatrist. (Rep. S.M.F. ¶¶ 264, 265).

Procedural History

11

Plaintiff's original complaint was filed July 12, 2017, and an amended complaint was filed August 21, 2017. Those pleadings are sealed because they contain confidential information. Plaintiff Chretien filed a substitute amended complaint alleging malpractice by attorney Robitzek and Berman & Simmons, P.A. on December 19, 2017. The substitute amended complaint is in the public court file.

On June 25, 2018, Plaintiff Chretien filed a motion for leave to file a second amended complaint. According to the motion, the purpose of the second amended complaint was to add new claims for fraudulent concealment, intentional misrepresentation and punitive damages, and also to provide further allegations relating to negligence, intentional outrageous conduct, egregious professional misconduct and emotional distress damages. The asserted impetus for the second amended complaint was the revelation in discovery that attorney Robitzek had known about the consequences of his failure to file Mr. Chretien's claim with the MHRC for a year or more before disclosing anything to Mr. Chretien.

On August 8, 2018, while Plaintiff's motion for leave to amend was still pending, the Defendants filed their Motion for Summary Judgment. The court granted leave for Plaintiff to file his second amended complaint later in August. Mr. Chretien filed an opposition to summary judgment on October 1, 2018. Defendants filed a reply in support of summary judgment on October 22, 2018.

In support of his claims, Mr. Chretien has designated an expert witness, Richard O'Meara, Esq., to testify on topics of "attorney malpractice, the merits of Mr. Chretien's whistleblower claim and causation." (Supp'g S.M.F. ¶ 139.)

12

With his opposition to Defendants' Motion for Summary Judgment, Plaintiff Chretien has submitted attorney O'Meara's supplemental affidavit dated September 28, 2018 in connection with Plaintiff's opposition to Defendants' Motion for summary judgment, elaborating on attorney O'Meara's designation and deposition testimony. The supplemental affidavit expands on the designation and provides more specifics about attorney O'Meara's evaluation of the value of Mr. Chretien's whistleblower counterclaim. Attorney O'Meara's supplemental affidavit asserts as his opinion that Mr. Chretien more likely than not would have prevailed on the whistleblower claim at trial and recovered compensatory and punitive damages of $500,000. Supplemental Affidavit of Richard O'Meara, Esq. ¶ 3(ii).

However, attorney O'Meara has not evaluated the merits of Mr. Chretien's other counterclaims against Allstate, (Supp'g S.M.F. ¶ 143.) He also has not evaluated the merits of Allstate's claims against Mr. Chretien or Mr. Chretien's exposure on those claims. (Supp'g S.M.F. ¶ 141-42.)

## Discussion

### 1. Standard of Review

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). To survive a defendant's

13

motion for summary judgment, the plaintiff must establish a prima facie case for every element of the plaintiff's cause of action. *See Savell v. Duddy*, 2016 ME 139, ¶ 18, 147 A.3d 1179.

On summary judgment, the court considers reasonable inferences that may be drawn from the facts. *Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18. Additionally, the nonmoving party benefits from all "favorable inferences that may be drawn from the facts presented." *Id.* "When facts or reasonable inferences are in dispute on a material point, summary judgment may not be entered." *Id.*

### 2. *The Issues Raised on Defendants' Motion*

The Defendants' Motion for Summary Judgment raises essentially two arguments:

First, Defendants contend that Plaintiff has not made a prima facie showing for purposes of summary judgment regarding an essential element of his claim: that Defendants' negligence, fraud or other actionable conduct caused Plaintiff any actual loss or injury. Specifically, Defendants contend that Plaintiff cannot present admissible evidence that the factfinder could accept as sufficient to show that Plaintiff would have recovered more than the settlement amount, either by virtue of a higher settlement or by virtue of a judgment entered after trial. Plaintiff contends that his evidence is sufficient to show that his whistleblower claim had a value over and above the settlement amount and therefore that Defendants' motion should be denied.

Second, Defendants contend that Plaintiff could not have prevailed on his whistleblower claim. Plaintiff contends that the fact that the federal court denied

14

summary judgment on the whistleblower counterclaim is sufficient to justify denying summary judgment in this case, and that there are genuine issues of material fact for the factfinder to resolve.

This Order addresses only the first of the Defendants' arguments and concludes that the Defendants are entitled to summary judgment on the element of causation.

3. *Whether This is an Ordinary Legal Malpractice or a "Failure to Plead" Case*

The parties devote considerable space in their filings to debating what category of legal malpractice case governs this case.

The Defendants contend that this case is governed by the ordinary standards under which, "[t]o prove attorney malpractice, a plaintiff must show (1) a breach by the defendant of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of that duty proximately caused an injury or loss to the plaintiff." *Brooks v. Lemieux*, 2017 ME 55, ¶ 9, 157 A.3d 798 (*quoting Pawlendzio v. Haddow*, 2016 ME 144, ¶ 9, 148 A.3d 713).

The Plaintiff, however, contends that this is a "failure to plead" case governed by the Law Court's decision in *Niehoff v. Shankman & Assocs. Legal Ctr., P.A.*, which defines a modified burden of persuasion standard when the "plaintiff's opportunity to get before the factfinder is lost." 2000 ME 214, ¶ 10, 763 A.2d 121. Plaintiff Chretien argues that attorney Robitzek, in effect, failed to plead a valid whistleblower claim. The Law Court in *Niehoff* said that the plaintiff's burden in resisting summary judgment in a "failure to plead" case is to

demonstrate that there are facts in dispute which are sufficient to allow a jury to conclude that: (1) the defendant attorney was negligent in representation of the plaintiff; and (2) the attorney's negligence caused the plaintiff to lose an opportunity to achieve a result, favorable to the plaintiff, which (i) the law allows; and (ii) the facts generated by plaintiff's M.R. Civ. P. 7(d) would support, if the facts were believed by the jury. Where a plaintiff generates fact disputes on these issues, summary judgment must be denied and plaintiff is entitled to proceed to trial.

*Id.*

The distinction between the *Brooks* "ordinary negligence" category and the *Niehoff* "failure to plead" category may be relevant to the Defendants' argument that, on its merits, Plaintiff's whistleblower claim would have failed. However, the distinction is not relevant to the Defendants' argument on causation, because the ordinary *Brooks* standard and the modified *Niehoff* standard both require a plaintiff to prove—and at the summary judgment stage to make out a prima facie showing—that the defendant attorney's negligence caused a loss or a lost opportunity to the plaintiff.

On the merits of the debate, the court agrees with the Defendants that this is not a "failure to plead" case. The Law Court decision in *Brooks v. Lemieux* indicates that if the plaintiff's claim has gone before the court on its merits, the claim has gone before the factfinder for purposes of *Niehoff*. In *Brooks*, the defendant attorney pleaded the wrong type of claim—an employment discrimination claim instead of the retaliation claim that the plaintiff claimed should have been brought—and the case was adjudicated on summary judgment, but the Law Court held nonetheless that the case did not constitute a *Niehoff* "failure to plead" case. *Brooks v. Lemieux*, 2017 ME 55, ¶ 12, 157 A.3d 798.

16

The court in *Brooks* said, "We have held that a modified malpractice standard applies where the alleged negligence is in failing to plead or timely plead so that plaintiff's opportunity to get before the factfinder is lost. *Niehoff v. Shankman & Assocs. Legal Ctr., P.A.*, 2000 ME 214, ¶ 9, 763 A.2d 121. This is not such a case." 2017 ME 55, ¶ 12, 157 A.3d 798. The court in *Brooks* distinguished *Niehoff* by noting that "this is not a case presenting the difficulty of proving that the plaintiff would have prevailed on a claim that was never brought." 2017 ME 55, ¶ 12 n.5, 157 A.3d 798 (internal quotes omitted).

Although Plaintiff Chretien contends that attorney Robitzek's failure to file Mr. Chretien's whistleblower claim with the MHRC constitutes a "failure to plead" for purposes of *Niehoff*, this case is more akin to *Brooks* than *Niehoff*. Just as the defendant attorney's failure in Brooks to plead a retaliation claim deprived his client of a particular theory of liability and remedy, so Attorney Robitzek's omission deprived Plaintiff Chretien of the right to claim certain types of damages and to claim attorney fees. Neither the plaintiff in *Brooks* nor Plaintiff Chretien was deprived of the "opportunity to get before the factfinder" on other theories of liability and remedies. In fact, Plaintiff Chretien's whistleblower claim went to trial, albeit not on all categories of damages permitted by the Whistleblower Protection Act. Moreover, the Law Court has applied the ordinary *Brooks* standard in a case in which the underlying cause of action was resolved by a settlement, as was the case with Plaintiff Chretien's cause of action. *See Allen v. McCann*, 2015 ME 84, ¶ 9, 120 A.3d 90.

17

Thus, the issue here is not whether "the attorney's negligence caused the plaintiff to lose an opportunity to achieve a result, favorable to the plaintiff," *Niehoff*, 2000 ME 214, ¶ 10, 763 A.2d 121. The issue is whether the Plaintiff Chretien could have obtained a better result than the result he did obtain, but for the Defendants' negligence.

In any case, as noted above, the plaintiff in either category of case must prove at trial—and must make a prima facie showing at the summary judgment stage—that the defendant attorney's negligence caused a loss to the plaintiff. The burden is framed somewhat differently—*Brooks* requires proof that "the breach of that duty proximately caused an injury or loss to the plaintiff," 2017 ME 55, ¶ 9, 157 A.3d 798, whereas *Niehoff* requires proof that "the attorney's negligence caused the plaintiff to lose an opportunity to achieve a result, favorable to the plaintiff," 2000 ME 214, ¶ 10, 763 A.2d 121.

Under either formulation, Plaintiff Chretien has the burden to prove that attorney Robitzek's negligence caused the loss of a better result than the one Mr. Chretien actually obtained through the settlement. Accordingly, this analysis moves ahead to the question whether the Plaintiff has made a prima facie showing that the Defendants' negligence caused the Plaintiff to lose the opportunity to obtain a better result.

18

### 4. *Whether Plaintiff has Made a Prima Facie Showing that Defendants' Negligence Caused Him Loss*

Plaintiff's perspective is that, under *Niehoff,* his burden is limited to proving the fact and the value of the lost opportunity to recover compensatory and punitive damages and attorney fees. Attorney O'Meara's supplemental affidavit, which the court is willing to consider at least in pertinent part, values the lost opportunity at about $500,000.

But a legal malpractice plaintiff's burden on causation has two parts. One part is to show that the defendant attorney's negligence resulted in the loss of an opportunity. Plaintiff Chretien has clearly met that part. The other part of the burden is to show that the loss of the opportunity caused the loss of a favorable result. A claim or opportunity lost as a result of an attorney's negligence is not actionable unless pursuing the opportunity would more likely than not have been of value or benefit to the attorney's client.

In this case, Plaintiff Chretien has the burden to make a prima facie showing that he would have obtained a better result had been able to pursue the lost opportunity. Based on the analysis below, the court concludes that Plaintiff Chretien has not made that prima facie showing.

There are two ways for Plaintiff Chretien to meet his burden of making a prima facie showing that the Defendants' negligence caused him to lose the opportunity to obtain a better result than he obtained through settlement. One way is to show he would have obtained a judgment after trial in a higher amount than the settlement

19

amount. The other way is to show that he would have obtained a higher amount in settlement. These will be analyzed in the order just enumerated.

Had Allstate's claims and Mr. Chretien's counterclaims gone to verdict, the jury would have decided one way or the other on Mr. Chretien's Whistleblowers' Protection Act counterclaim, and could have been asked to answer a special interrogatory about whether Mr. Chretien qualified as an employee of Allstate for purposes for the protection of the Act. The jury's verdict would also have determined the amount, if any, that Allstate was entitled to recover on its claims.

If the jury made awards to both parties, the federal court would look to state law to determine whether to set off the jury awards against each other in the judgment. *See National Jockey Club v. Ganassi*, 740 F. Supp. 950, 969-70 (N.D. Ill. 2010) (applying Illinois law regarding to a setoff of verdicts); *Weitz Co., LLC v. MH Wash., LLC*, 2009 U.S. Dist. LEXIS 135022 (W.D. Mo.) (applying Missouri law to set off verdicts).

Under Maine law, because the verdicts on Allstate's claims and Plaintiff Chretien's counterclaims would have been on claims and counterclaims between the same parties in the same case, the total amount awarded to Allstate on its claims would be netted against the total amount awarded to Mr. Chretien on his counterclaims, and whichever party received the higher award would be granted judgment in the amount by which its award exceeded the award to the other party. *See Guilford Yacht Club Ass'n v. Northeast Dredging, Inc.*, 438 A.2d 478, 479 n.1 (Me. 1981).

But because the trial ended before verdict, it is now impossible to determine what the verdict would have been, and specifically, impossible to determine whether

20

Plaintiff Chretien would have obtained a judgment for more than the amount he settled for.

Because Plaintiff Chretien has not presented evidence in his opposition to summary judgment about the strength or value of Allstate's claims against him, he cannot present evidence of the amount of the net judgment he would or could have obtained after trial. Attorney O'Meara's assessment of the strength and value of the lost whistleblower remedies would be insufficient to support a verdict in this case, because the jury in this case would have no basis on which to decide the amount by which a damages award on Plaintiff Chretien's counterclaims would be offset by a damages award on Allstate's claims.

The other avenue for Plaintiff Chretien to meet his burden is to show that he more likely than not would have obtained a more favorable result through a higher settlement had he been able to pursue his claims. This was the plaintiff's contention in *Allen v. McCann*, 2015 ME 84, ¶ 11, 120 A.3d 90. The Law Court rejected the contention as follows:

> Allen argues that she suffered a measurable loss due to McCann's failure to advise her to perform a work search. However, Allen settled with her employer, and because of the settlement, her proffered damages calculation is speculative. Attorney MacAdam's assertion, without further detail or explanation, that he believes that he could have settled for more had Allen been receiving an additional $150 per week in workers' compensation benefits, does not provide a foundation upon which a jury could assess damages without resort to speculation. The other party to the settlement, the employer, certainly has its own settlement criteria, which may or may not have focused upon the weekly benefit rate. Because the factors producing a settlement cannot be ascertained or weighed in hindsight, attempting to calculate an award of damages is speculative. Summary judgment was correctly granted.

21

*Id.*

The same analysis applies here.

There is no evidence that Allstate would have been willing to pay more in settlement had Plaintiff Chretien been able to pursue compensatory and punitive damages and attorney fees under the Whistleblowers' Protection Act. Judge Kornreich was clear that Allstate's final offer—the offer that Plaintiff Chretien accepted—was all that Allstate was prepared to pay.

Moreover, as the Law Court opinion in Allen v. McCann points out, "the factors producing a settlement cannot be ascertained or weighed in hindsight." *Id.* Settlements just before or during trial are common, and are influenced by a wide variety of factors and considerations. Plaintiff Chretien's position appears to be that the additional value of the lost whistleblower remedies can simply be added onto what Allstate paid in settlement, but to do so is an exercise in pure speculation. It cannot simply be assumed that Allstate would have paid any particular additional amount— much less the full $500,000 value estimated by attorney O'Meara—had Mr. Chretien been able to pursue the lost whistleblower remedies.

The conclusion that Plaintiff Chretien has failed to make a prima facie showing that the Defendants' negligence caused him to obtain a less favorable result than he could have but for the negligence entitles the Defendants to summary judgment on the three counts of the Second Amended Complaint. This is most evident as to the legal malpractice claim in Count I and the vicarious liability claim in Count II, but still

22

the case as to the fraudulent concealment claim in Count III, which also requires proof of some form of loss, injury or harm. *See Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280 (elements of fraudulent concealment include proof of reliance "to the aggrieved party's detriment"). A sufficient showing of causation is required on claims of fraud and fraudulent concealment, as it is on claims of negligence. *See Wilson v. Lilley*, P.A., 2016 Me. Bus. & Cons. Ct. LEXIS (granting defendants' motion for summary judgment on claims of negligence, fraud, and fraudulent concealment based on plaintiffs' failure failed to proffer sufficient expert evidence on proximate causation).[3]

## Conclusion

"A defendant is entitled to a summary judgment if there is so little evidence tending to show that the defendant's acts or omissions were the proximate cause of the plaintiff's injuries that the jury would have to engage in conjecture or speculation in order to return a verdict for the plaintiff." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757. *See* Steeves v. Bernstein, Shur, Sawyer & Nelson, P.C., 1998 ME 210, ¶ 13, 718 A.2d 186 (summary judgment in legal malpractice case is appropriate "when the link between the attorney's act or omission and the alleged damage is overly speculative.").

---

[3] It is difficult to see how Plaintiff Chretien could show detrimental reliance in connection with his agreement to the settlement, because by then he knew that attorney Robitzek's negligence had deprived him of the ability to pursue certain Whistleblowers' Protection Act remedies. If there was reliance by Mr. Chretien, it was during the period before attorney Robitzek made the disclosure of his negligence. Even as to that period, Plaintiff has not shown that, if he could have changed lawyers, the outcome would more likely than not have been better than it turned out to be.

23

In this case, Plaintiff had the burden to present in his Additional Statement of Material Facts a proffer of expert evidence establishing a causal link between Defendants' negligence and some injury or loss sustained by Plaintiff, be it the loss of the opportunity to obtain a better settlement or the loss of the opportunity to obtain a judgment after trial for more than the settlement amount. *See Pawlendzio v. Haddow*, 2016 ME 144, ¶ 15, 148 A.3d 713) (defendant attorney entitled to summary judgment in part because "there is no other proffered expert evidence in the Pawlendzios' statement of material facts establishing a causal link between Haddow's alleged breach of duty and the Pawlendzios' injury").

Whether Plaintiff suffered any loss at all as the result of Defendants' negligence, and certainly the amount of any loss, is a matter of conjecture and speculation. Plaintiff has not made a showing as to an essential element of his cause of action—the causal link between Defendants' negligence and any pecuniary loss or harm—sufficient to withstand summary judgment.

IT IS HEREBY ORDERED AND ADJUDGED:

1. Defendants' Motion for Summary Judgment is hereby granted.

2. Judgment on the Second Amended Complaint is granted to Defendants against Plaintiff, together with the costs recoverable by a prevailing party.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order on the docket for this case by incorporating it by reference.

Dated December 10, 2018

A. M. Horton, Justice

Entered on the Docket: 12-11-18

24

STATE OF MAINE                                    SUPERIOR COURT

Cumberland, ss.


RUSSELL CHRETIEN

                  Plaintiff

        v.                          Docket No. PORSC-CV-17-265

BERMAN & SIMMONS and WILLIAM ROBITZEK

                  Defendants



STATE OF MAINE
Cumberland ss Clerk's Office
SEP 04 2018 10:30AM
RECEIVED

## ORDER ON PLAINTIFF'S MOTION
## FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

Plaintiff Russell Chretien has brought an action for legal malpractice against Defendants Berman & Simmons, P.A. and William Robitzek, Esq.  Plaintiff has filed a Motion for Leave to File Second Amended Complaint.  Defendants have filed an opposition and Plaintiff has filed a reply memorandum.

Shortly after filing their opposition, Defendants filed a Motion for Summary Judgment that, as of this writing, is not fully briefed.  For reasons set forth below, the court has elected to take up the Plaintiff's Motion separately rather than defer consideration until Defendants' Motion is ready for decision.

Plaintiff's Motion seeks to add to the theories of liability already set forth in his first Amended Complaint claims for fraudulent concealment, intentional misrepresentation and punitive damages, and also seeks to add factual allegations intended to support the existing and new claims.

1

Defendants' opposition to the Motion asserts two major objections—that the Plaintiff's Motion is untimely and that the Motion is futile because Plaintiff cannot prevail on any of the proposed additional claims.

The starting point for the analysis is Rule 15(a) of the Maine Rules of Civil Procedure, which calls for leave to amend to be "freely given when justice so requires." *See Diversified Foods, Inc. v. First National Bank*, 605 A.2d 609, 616 (Me. 1992). "This mandate means that 'if the moving party is not acting in bad faith or for delay, the motion will be granted in the absence of undue prejudice.' " *Id.*, *quoting* 1 Field, McKusick & Wroth, § 15.4 (1970).

The factors that go into determining whether leave to amend should be granted include:

- The timing of the motion for leave: A motion made within the period set in the scheduling order for the case is presumptively timely. A motion made beyond that deadline is not necessarily untimely, but other factors may result in leave being denied.

- The reasons for any delay in the timing of the motion: If the moving party legitimately could not have made the motion earlier, the timing of the motion, in and if itself, will not weigh against granting leave to amend. However, "undue delay removes any presumption in favor of allowing amendment." Diversified Foods, Inc., 605 A.2d at 616 (internal quotes omitted).

2

- Bad faith: An improper purpose or motive on the part of the moving party weighs substantially against granting leave to amend.

- Undue prejudice: A request for leave to amend that will cause undue prejudice to an opposing party, meaning harm or detriment beyond the mere potential for liability on the proposed new claims or allegations, may be denied on that ground. *See Holden v. Weinschenk*, 1998 ME 185, ¶ 6, 715 A.2d 915 (leave to amend properly denied when request made after entry of summary judgment against the moving party); *Drinkwater v. Patten Realty Corp.*, 563 A.2d 772, 778 (Me. 1989) (denial upheld of motion for leave to amend made three years after commencement of case and five days before trial).

- Futility: When the proposed amendment would be futile, i.e. the moving party could not prevail on the proposed additional claims, leave to amend may be denied on that ground alone. *See Glynn v. City of South Portland*, 640 A.2d 1065, 1067 (Me. 1994) ("[W]hen . . . a proposed amended complaint would be subject to a motion to dismiss, the court is well within its discretion in denying leave to amend.")

Defendants object to Plaintiff's Motion on the ground that it is untimely and that what they say is Plaintiff's undue delay will cause them undue prejudice. Defendants also object on the ground that the proposed amendment would be futile, not because it fails to state a claim for purposes of a motion to dismiss, but because

3

Defendants would be entitled to summary judgment on the new claims, just as they contend they are on the current claims.

In an unrecorded conference call with counsel this morning, the court advised that it is not inclined to decide the Motion based on either side's contention that the other side has either failed diligently to pursue discovery or failed diligently to respond to discovery. The court understands each side's perspective on the other's performance but does not deem either side's perspective either so compelling or so without merit that either side should be faulted or that discovery issues should be the basis for deciding Plaintiff's Motion for Leave to Amend.

Likewise, because the proposed new claims are plainly cognizable for purposes of withstanding a motion to dismiss, the Plaintiff's Motion cannot be deemed futile.

Accordingly, the focus will be on the factors of the timeliness of the Motion in relation to the inception and schedule for the case; undue prejudice to Defendants, and bad faith. Although the Motion was filed after the scheduling order deadline for amendment of the pleadings and thus cannot be deemed presumptively timely, it was filed before the close of discovery and it does not appear to allege any entirely new cause of action. Instead, it essentially alleges new theories of liability on the same cause of action set forth originally and new claims for relief in the form of money damages.

There has been no showing of bad faith on either side's part and any prejudice to the Defendants is limited, given the nature of the proposed new claims. Moreover, any prejudice to Defendants can be alleviated.

4

Finally, the benefit to the parties and the court of addressing Plaintiff's Motion outside the context of summary judgment is that the Defendants' pending Motion for Summary Judgment, with any amendment or supplementation allowed by this Order, can be addressed by the parties and decided by the court without any uncertainty about which claims are at issue.

Accordingly, it is hereby ORDERED AS FOLLOWS:

1. Plaintiff's Motion for Leave to File Second Amended Complaint is hereby granted. The copy of the proposed Second Amended Complaint attached to Plaintiff's Motion as Exhibit 2 shall be docketed separately.

2. Defendants' deadline for answering or otherwise pleading in response to the Second Amended Complaint is hereby extended. If the court denies Defendants' Motion for Summary Judgment in whole or part, either in that Motion's present form or as revised, Defendants shall answer or otherwise plead in response to the Second Amended Complaint 20 days after the court's ruling on Defendants' Motion is docketed.

3. Defendants may file an amended Motion for Summary Judgment and memorandum, or may supplement their present Motion, by no later than September 14, 2018. If Defendants elect to rely on their pending Motion without revision or supplementation, they shall so notify the Clerk in writing by September 14, 2018.

4. Plaintiff's deadline for filing an opposition to Defendants' Motion is hereby extended to 21 days after Defendants have either filed an amendment or supplement

5

to their Motion, or filed a letter with the Clerk advising that they will rely on their present filings.

5.    Defendants' reply deadline is 14 days after the filing of Plaintiff's opposition.

6.    The Clerk will schedule Defendants' Motion for oral argument on an available date in November 2018.

7. If claims remain pending after the court's ruling on Defendants' Motion, a conference of counsel will be convened to discuss the schedule for remaining phases of the case.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated August 31, 2018

A. M. Horton, Justice

*Russell Chretien vs. Berman & Simmons PA, et al.,* PORSC-CV-17-265

**Plaintiff's Counsel:**

David Webbert, Esq.
Philip Johnson, Esq.
Johnson Webbert & Young

**Defendants' Counsel:**

John Aromando, Esq.
Katharine Rand, Esq.
Sara Murphy, Esq.
Pierce Atwood